1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MICHAEL ANGEL CORRAL,                    Case No.  1:19-cv-01719-KES-HBK (HC)

12              Petitioner,                   FINDINGS AND RECOMMENDATIONS TO
                                              DENY PETITIONER'S PETITION FOR
13        v.                                  WRIT OF HABEAS CORPUS AND
                                              DECLINE TO ISSUE CERTIFICATE OF
14   PATRICK COVELLO,                         APPEALABILITY [1]

15              Respondent.                   FOURTEEN-DAY OBJECTION PERIOD

16

17

18   **I.    STATUS**

19        Petitioner Michael Angel Corral ("Petitioner" or "Corral"), a state prisoner, is proceeding

20   pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on December 4,

21   2019.  (Doc. No. 1, "Petition").  Petitioner challenges his 2016 convictions after a bench trial for

22   two counts of rape by means of force, violence, duress, menace, or fear of immediate and

23   unlawful bodily injury on the person in violation of Penal Code § 261(a)(2) and two counts of

24   false imprisonment in violation of Penal Code § 236, for which he was sentenced by the Kern

25   County Superior Court to consecutive terms of twenty-five years to life on each rape count, with

26   additional sentences for the false imprisonment convictions stayed.  (Case No. LF010559A).

27   _____

28   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2022).

(Doc. No. 13-1 at 207-10; Doc. No. 13-8 at 6).[2]  The Fifth Appellate District Court affirmed

Corral's conviction on direct appeal.  (Case No. F074253).  (Doc. No. 13-8 at 1).  On June 19,

2019, the California Supreme Court summarily denied Corral's petition for review.  (Case No.

S255312).  (Doc. No. 13-12).

The Petition presents two (restated) grounds for relief:

> (1) The trial court failed to obtain a knowing and intelligent waiver
> of Petitioner's right to a jury trial.

> (2) The trial court improperly allowed Petitioner's statements to be
> admitted into evidence in violation of *Miranda*.

(*See generally* Doc. No. 1 at 48-92).

Respondent filed an Answer (Doc. No. 14), arguing Petitioner was not entitled to relief

and lodged the state court record in support (Doc. No. 13, 13-1 through 13-12).  Petitioner filed a

Reply to the Answer.  (Doc. No. 20).  This matter is deemed submitted on the record before the

Court.  After careful review of the record and applicable law, the undersigned recommends the

district court deny Petitioner relief on his Petition and decline to issue a certificate of

appealability.

## II.    GOVERNING LEGAL PRINCIPLES

### A.    Evidentiary Hearing

In deciding whether to grant an evidentiary hearing, a federal court must consider whether

such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474

(2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*

Petitioner did not request an evidentiary hearing.  This Court independently finds that the

pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

////

---

[2] All citations to the pleadings and record are to the page number as it appears on the Case Management
and Electronic Case Filing ("CM/ECF") system.

**B.      ADEPA General Principles**

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572 U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

1    [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

2    extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

3    407 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief

4    so long as fair-minded jurists could disagree on the correctness of the state court's decision."

5    *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court

6    decision "was so lacking in justification that there was an error well understood and

7    comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

8          When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

9    State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

10   the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

11   *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

12   merely because the federal habeas court would have reached a different conclusion in the first

13   instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

14         Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

15   constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

16   *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court recently explained, while the

17   passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't

18   eliminate *Brecht's* actual-prejudice requirement. *Brown v. Davenport*, ––– U.S. ––––, 142 S. Ct.

19   1510, 1524, 212 L.Ed.2d 463 (2022). In other words, a habeas petitioner must satisfy *Brecht*,

20   even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether

21   or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal

22   court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA.

23   But to grant relief, a court must find that the petition has cleared both tests." *Id.* at 1524.

24         As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

25   an "adjudication on the merits" in state court. An adjudication on the merits does not require that

26   there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

27   at 98. "When a federal claim has been presented to a state court and the state court has denied

28   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

4

1    of any indication or state-law procedural principles to the contrary." *Id*. at 99.  "The presumption

2    may be overcome when there is reason to think some other explanation for the state court's

3    decision is more likely." *Id*. at 99-100.  This presumption applies whether the state court fails to

4    discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

5    289, 293, 298-301 (2013).

6          While such a decision is an "adjudication on the merits," the federal habeas court must

7    still determine the state court's reasons for its decision in order to apply the deferential standard.

8    When the relevant state-court decision on the merits is not accompanied by its reasons,

9          the federal court should "look through" the unexplained decision to
10         the last related state-court decision that does provide a relevant
           rationale. It should then presume that the unexplained decision
11         adopted the same reasoning.  But the State may rebut the
           presumption by showing that the unexplained affirmance relied or
12         most likely did rely on different grounds than the lower state court's
           decision, such as alternative grounds for affirmance that were
13         briefed or argued to the state supreme court or obvious in the record
           it reviewed.

14   *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state

15   court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

16   decision, as AEDPA directs us to do." *Id*. at 1196.

17   **III.    RELEVANT FACTUAL BACKGROUND**

18         The Court adopts the pertinent facts of the underlying offenses, as summarized by the

19   California Fifth District Court of Appeal.  A presumption of correctness applies to these facts.

20   *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

21

22         **FACTS AND PROCEDURAL HISTORY**

23         **I. Rapes of Natalie and Ashley**

24         ***A. Respective Testimony of Natalie and Ashley***

25         On March 30, 2015, Natalie and Ashley, 14-year-old friends, spent
     time hanging out at the Valley Plaza Mall in Bakersfield. They
     obtained some "weed" and smoked it. Around 10:00 p.m., the girls
26   went to a Jack-In-The-Box restaurant by the mall. While there,
     Ashley got a Facebook message from her friend "Ruby" about a
27   party taking place in Arvin that night. The girls expressed interest
     in attending the party. Ruby messaged Ashley, also via Facebook,
28   that Ruby's friend would pick them up in a "red car" and drive them

5

1     to the party.

2     Corral came to collect the girls from the mall in a red two-door coupe. Ashley got in the passenger seat and Natalie the back seat.

3     Corral introduced himself as "Robert." Corral stopped at a liquor store where he bought three "Four Lokos" (flavored beer)

4     beverages (with Natalie's money). They eventually arrived at a gym facility in "the middle of nowhere," with a pool and lighted fields.

5     Corral said he would contact the party host to see why nobody was there. He then told Natalie and Ashley that the party was canceled.

6

7     Ashley testified that she was not worried at that point because everything "was going good." Specifically, she noted: "We are having a good time. I mean, we are drinking. We got out. There is,

8     like, a little pool."

9     Natalie testified that they asked Corral to take them back to Bakersfield, to see whether they could find a party there. However,

10    Corral stood around for 20 minutes, purportedly trying to communicate with the girl who was throwing the Arvin party. The

11    girls got back in the car to wait for him. When Corral returned to the car, he suddenly pulled a knife on Ashley (who was sitting in

12    the front passenger seat) and ordered her to "[g]et undressed." Ashley was shocked and asked him whether he was serious; she

13    then had an anxiety attack and passed out. Corral turned to Natalie—who was panicking, crying, and praying—and ordered her

14    out of the car.

15    After Natalie got out of the car, Corral told her, at knifepoint, to take her clothes off. He cut her "underwear off right on the sides."

16    Corral then ordered her to the ground, pulled down his pants, got on top of her, and put his penis inside her vagina. After "rap[ing]"

17    Natalie on the ground, he made her sit in the car, and "raped" her again. Natalie added: "And then after that, I think he raped me

18    again outside. I am trying to block it out."

19    When Ashley awoke, Corral, who was still holding the knife, told her to take off all her clothes. He also told her to "chug" her beer.

20    While she was still in the car, Corral cut off her underwear and put his penis in her vagina. Ashley felt pain as Corral put his penis in

21    her vagina. Although Ashley only remembered Corral raping her inside the car, Natalie testified that Corral raped Ashley just outside

22    the car as well. Natalie testified that she saw Corral's penis go inside Ashley's vagina both times, as Natalie was sitting on the dirt

23    right next to the car's open passenger door.

24    Natalie further testified: "[Corral also] made me lick [Ashley's] private parts. And she had to do the same thing as me, and if we

25    didn't act like we liked it, then he would put the knife to our neck. He said that if we don't want to die, then we have to please each

26    other." This went on for "20 minutes at the most." Natalie added: "[Corral then] made me and Ashley suck his penis." Ashley

27    testified that Corral also made Natalie "lick his butt."

28    Eventually, Corral started throwing up from drinking. As he was

throwing up, the girls were able to slip out and run from the car. Natalie left her bag in the car. As they ran through the woods to a nearby house (Ashley had seen a light shining from the house), Natalie fell and suffered "bruises all over," including on her ankle. Once at the house, they knocked on the door and asked for help. The homeowner called the police, who arrived quickly and took the girls for sexual assault examinations. Natalie clarified that she had lost her phone that night (she possibly left it at the Jack-In-The-Box); Ashley had her phone but it "died" when they "first got to the pool."

Natalie identified Corral during her trial testimony, stating that he was the person who picked them up from the mall; she noted, however, that Corral's hair was "longer, more messy" at that time of the rapes. Natalie also identified a photograph of Corral's car with her bag inside it. Ashley was unable to identify Corral as the person who had picked them up from the mall, stating that he "looks different." However, she said she had seen Corral somewhere before. Ashley said the man who raped them had very little hair, more like "prickles," and that the defendant's hair was longer than what she remembered. Both girls denied telling the police that the man who raped them had a bald head. (The video of Corral's interrogation on the day following the incident in question shows that Corral had short black hair at the time.)

### B. Testimony of Virginia Bustillos (woman who called 911)

Virginia Bustillos lived in a remote area of Arvin. The area had "a lot of trees" but "[o]nly one house." Around 2:00 a.m. on March 31, 2015, "somebody knocked [on her] window" and woke her up. "It was two girls yelling and [saying] they had been raped." Bustillos called 911 and police responded in four minutes.

### C. Testimony of Kimberly Gonzalez, Sexual Assault Nurse

Kimberly Gonzalez performs "Sexual Assault Response Team" examinations (SART exams) at San Joaquin Hospital in Bakersfield. Gonzalez described the scope of a SART exam: "The purpose of the exam is to gather complete subjective information from the patient and then take them into the exam room, where I do an objective assessment from head to toe."

On March 31, 2015, at 6:00 a.m., Gonzalez commenced the SART exam process for Ashley. Ashley's vaginal exam did not yield any physical findings or reveal any injuries; however, Ashley had an abrasion on her hip. Gonzalez testified that she did not know whether Ashley was raped but noted that in girls of Ashley's age, "we have a possibility of seeing [an] injury and a possibility of not seeing an injury." Thus, a lack of any injuries was not inconsistent with the fact that "something happened," including intercourse. Gonzalez also collected oral, cervical, vaginal, and anal swabs, as well as a urine sample, from Ashley.

Gonzalez commenced the SART exam process for Natalie at 6:15 a.m. on the same day. Natalie's vaginal exam also yielded no

7

physical findings. However, Gonzalez observed a laceration to the anal folds during an anal exam. Gonzalez also noted that Natalie had "multiple bruises on her body," including "an abrasion to her left ankle." Gonzalez testified that her findings were consistent with the history provided by Natalie. Finally, Gonzalez collected oral, cervical, vaginal, and anal swabs, as well as a urine sample, from Natalie.

### D. Testimony of Kelly Woolard, DNA Analyst at Kern Regional Crime Lab

Kelly Woolard, a DNA analyst at the Kern Regional Crime Lab, analyzed swabs collected from Natalie, Ashley, and Corral. DNA analysis involves "autosomal STRs" and "Y-STRs." Woolard explained: "Everybody has [autosomal STRs,] those short tandem repeats section of DNA that come from 22 pairs of chromosomes. The Y-STRs come from the sex-determining chromosome [and is specific to males only]."

Corral was excluded as a contributor of the DNA profile generated from Natalie's vaginal swabs. As for Ashley's vaginal swabs, Corral was excluded as a contributor of autosomal STRs. Regarding the YSTRs in the DNA profile generated from Ashley's vaginal swabs, Woolard testified: "[T]he Y-STR profile that was obtained from the swab was very low level and partial, meaning it was not a complete, full profile. So due to our interpretation guidelines ... I was not able to interpret it because it was so low level. So, therefore, it was just an inconclusive profile." Woolard confirmed, however, that there were *no* sperm profiles on the vaginal swabs from both Natalie and Ashley; rather the only DNA profiles generated were from "regular [skin or tissue] cells" as opposed to "sperm [cells]." Finally, regarding the penile swab from Corral, both Ashley and Natalie were excluded as contributors to the DNA found on that swab.

The parties stipulated that Ashley's urine tested positive for cannabinoids and Natalie's urine tested positive for cannabinoids and amphetamine.

### E. Testimony of Ruby, Ashley's Friend

Ruby was in juvenile hall for seven months starting in February 2015. She did not have access to a computer or cell phone in juvenile hall. Although Ruby had a Facebook account, she could not access it while she was in juvenile hall. Prior to the time she was sent to juvenile hall, she would access her Facebook account via her own cell phone as well as the cell phones of people she knew. Ruby knew Corral and had used his cell phone to access her Facebook account in January 2015. Ashley and Ruby were Facebook friends. At some point, while Ruby was in juvenile hall, an officer showed her messages sent from her Facebook account to Ashley. Ruby did not send those messages.

////
////
////

8

## II. Police Investigation

### A. Testimony of Kern County Sheriff's Deputy Anhtu Phan

On March 31, 2015, at approximately 2:00 a.m., Kern County Sheriff's Deputy Anhtu Phan was dispatched to a "residence in the middle of nowhere," on the outskirts of Bakersfield. He explained the nature of the call: "It was a suspicious investigation. We were told that two females had run up to the house, banged on the door, and told the homeowner that they had been raped." On arrival at the house, Phan contacted Ashley and Natalie. "[Ashley] seemed pretty normal. She didn't seem traumatized or anything." "Natalie appeared scared and more traumatized."

Phan first spoke to Ashley. "Ashley described [the perpetrator] as a white male in his early 20s, approximately five foot eight, 250 pounds with a bald head." She specifically used the word, "bald." Phan spoke separately to Natalie. Natalie gave a similar description of the perpetrator and also specifically said he had a "bald head." Subsequently, Phan went to Ashley's house to show her a "photo lineup" that included a photograph of Corral. Ashley identified Corral from his photograph as the person who raped her.

### B. Testimony of Kern County Sheriff's Deputy Sean Dunshee

Kern County Sheriff's Deputy Sean Dunshee was dispatched along with Deputy Phan in response to Bustillos's 911 call on March 31, 2015. Dunshee testified: "[While Deputy Phan was talking to the girls], I ... overheard that the attack happened at a gym nearby, and I was aware of a facility which was a residence converted into a gym within approximately half mile of the location that we located the females at." The "area around it is surrounded either by orchards, dirt roads, [and a] Grimmway [Farms] facility."

Dunshee went to the gym location the same day. He testified that he found "beer cans" and "[c]igarette butts" on the property; three of the beer cans were Four Lokos brand. He added: "I located [what] appears to be vomit locations at the scene, different locations, and two pairs of women's underwear." Both pairs of underwear had "straight cut line[s]" through them, indicating they were cut apart by "a sharp object."

### C. Corral's Arrest on April 1, 2015

Later that same evening, at 11:30 p.m. on March 31, 2015, Corral turned himself in at the Arvin Police Department. Dunshee testified: "Arvin Police Department had contacted our dispatch center and advised us a subject had come to their office and wanted to turn themselves in regarding a current ongoing case." Dunshee went to Arvin Police Department, where he met Corral and his mother. Dunshee then transported Corral to the sheriff's substation in Lamont. Dunshee recorded his entire interaction with Corral.

Corral was interrogated at the Lamont substation by Senior Deputy Sheriff Jeffrey Colbert (the circumstances surrounding the

1

2

3

4

interrogation, as well as its substance, are addressed post, in the discussion section of this opinion). At the end of the interrogation Corral was arrested and taken for a sexual assault exam. Colbert subsequently executed a search warrant on Corral's car, in which he found female clothing and bags and an Ikea paring knife. Ashley's cell phone was found in Corral's neighborhood.

5

6

7

8

9

Corral was charged, by amended information, with two counts of rape by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person (Pen. Code, § 261, subd. (a)(2); counts 1 and 2), and two counts of false imprisonment (§ 236; counts 3 and 4). An enhancement for personal use of a firearm or deadly weapon in the commission of forcible rape (§ 667.61, subd. (e)(3)) and one for forcibly raping more than one victim (§ 667.61, subd. (e)(4)) were alleged in connection with counts 1 and 2.

10

11

Criminal proceedings were suspended for almost three months for evaluation of Corral's competency to stand trial but ultimately were reinstated.

12

13

14

15

Corral waived his right to a jury trial and was subsequently found guilty of all counts by the trial court. The court also found the enhancement allegations to be true. The court sentenced Corral to state prison for 50 years to life (consecutive terms of 25 years to life for counts 1 and 2; additional sentences for counts 3 and 4 were stayed pursuant to § 654).

16

(Doc. No. 13-8 at 1-6 (footnotes omitted)).

17

**IV.    ANALYSIS**

18

Both of Petitioner's grounds were raised on direct appeal to the Fifth Appellate District

19

Court and denied on the merits, then subsequently raised and summarily denied by the California

20

Supreme Court.  Thus, each ground is exhausted, and the Court looks through to the Fifth

21

Appellate District's reasoned decision in evaluating each of Petitioner's claims under the

22

deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

23

**A.    Ground One-Waiver of Petitioner's Right to a Jury Trial**

24

In his ground one, Petitioner argues his waiver of his right to a jury trial was ineffective

25

because it was not knowing and intelligent.  (Doc. No. 1 at 52).  Specifically, Petitioner contends

26

the trial court did not inform him that "all 12 jurors would have to *unanimously* agree to his guilt

27

as to each charged count" or that he would be allowed to participate in choosing the jury.  (*Id.* at

28

54-56).  Petitioner asserts the trial court had a heightened burden in ensuring his waiver was

1    knowing and intelligent because the court had reason to believe Petitioner suffered from mental

2    or emotional instability.  (*Id.* at 62).  Additionally, Petitioner argues his "lack of knowledge and

3    experience with the judicial system made a thorough colloquy by the court on the rights he was

4    giving up all the more essential."  (*Id.* at 63).

5            Respondent argues Petitioner is not entitled to relief because the state appellate court's

6    decision was not an unreasonable application of federal law.  (Doc. No. 14 at 21).  Citing *Crosby*

7    *v. Schwartz*, 678 F.3d 784 (9th Cir. 2012), Respondent argues the colloquy here was "more

8    searching and detailed" than the one found sufficient in *Crosby*.  (*Id.* at 21-25).  Respondent

9    asserts that questions regarding Petitioner's competency are immaterial because (1) the rule that a

10   more searching colloquy is required when a defendant's mental or emotional state is at issue is

11   not clearly established federal law because it relies on Ninth Circuit—rather than Supreme

12   Court—precedent; and (2) even if the rule applied, Petitioner was found competent to stand trial

13   before waiving his right.  (*Id.* at 25-26).

14                      **1.    State Court Decision**

15           In denying Petitioner's insufficient waiver claim, the Fifth Appellate District court found

16   as follows:

17               **I. Waiver of Jury Trial**

18               Corral argues the trial court failed to provide adequate advisements
             before accepting his waiver of the right to a jury trial and, as a
19           result, his waiver was not knowing and intelligent. He contends the
             error is structural and his convictions must therefore be reversed.
20           Applying the "totality of the circumstances" test to evaluate the
             validity of Corral's jury trial waiver, we reject his contentions and
21           affirm.

22               ***A. Background***

23               The following discussion took place between the court and the
             parties prior to trial:

24               "THE COURT: This is the time and place set for a jury trial.

25               "Counsel, we had a conversation in chambers this morning
             regarding potentially settling this case, and in doing so, there were
26           representations made in chambers regarding whether this matter
             would go forward as a jury trial or if both sides would waive that
27           right and proceed by way of a court trial. [¶] ... [¶]

28               "As far as a jury trial is concerned, [defense counsel], have you

                                      11

1    talked to your client about whether he wants to proceed by a jury
2    trial or a court trial?

3    "[DEFENSE COUNSEL]: Your Honor, I discussed the matter with
     him this morning. It is my understanding, at least as of this
     morning, that he wanted to proceed by way of a court trial and was
4    willing to waive his right to trial by jury.

5    "Let me just inquire of the defendant again if that's his desire.

6    "And I discussed the matter with him again, and it's my
     understanding that he is willing to affirmatively state on the record
7    that he is waiving jury and going by way of court trial. That's his
     desire.
8
     "THE COURT: Okay. Mr. Corral, before I can accept a waiver of a
9    jury trial, I must advise you of certain rights that you have. Okay?

10   "THE DEFENDANT: Yes, sir.

11   "THE COURT: You have the right to a jury trial. That is, you have
     the right to have the People prove the truth of the charges beyond a
12   reasonable doubt to a jury of 12 individuals selected from within
     this community, and they would decide, with the presumption of
13   innocence in mind, whether you are guilty beyond a reasonable
     doubt of the truth of the charges based only on evidence presented
14   inside of this courtroom.

15   "Do you understand that right?

16   "THE DEFENDANT: Yes, sir.

17   "THE COURT: Now, at a jury trial, you have the right, as you
     would at a court trial, to confront and cross-examine all witnesses
18   who come forward and testify against you. You also have the right
     to use the subpoena power of the Court to compel a person to testify
19   on your own behalf and the right to present any defense you wish.

20   "You have an absolute right against self-incrimination. That is, you
     have a right not to testify if you choose to. You also have a right to
21   testify if you choose to.

22   "At whatever trial we have, you also have the right to have an
     attorney to represent you.
23
     "Now, if you waive your right to a jury trial, you still maintain all
24   of those other rights. The only exception is that the People would
     have to prove the truth of the charges beyond a reasonable doubt
25   with the presumption of innocence being applied to a court, and the
     judge would make the decision as the fact finder in the case, not the
26   jury.

27   "Do you understand that?

28   "THE DEFENDANT: Yes, sir.

                                      12

1

2    "THE COURT: Do you have any questions regarding your right to
a jury trial? Have you had enough time to talk to your attorney
3    about your right to a jury trial?

4    "THE DEFENDANT: No. Not enough time.

5    "THE COURT: "You haven't had enough time? Would you like
more time to talk to him?

6    "THE DEFENDANT: Please.

7    "THE COURT: Sure. We'll take a momentary recess.

8    "(A recess was taken.)

9    "THE COURT: Back on the record in People vs. Corral.

10   "Mr. Corral, have you had sufficient time to talk to your attorney?

11   "THE DEFENDANT: Yes.

12   "THE COURT: And regarding your right to a jury trial, are you
waiving that right to a jury trial so as to proceed by way of a court
13   trial?

14   "THE DEFENDANT: Yes.

15   "THE COURT: So you waive your right to a jury trial?

16   "THE DEFENDANT: Yes.

17   "THE COURT: Thank you

18   "[Prosecutor], the People also have a right to a jury trial.

19   "At this time do the People waive their right to a jury trial?

20   "[THE PROSECUTOR]: Yes, we'll waive.

21   "THE COURT: The Court will accept those waivers and go by way
of a court trial."
22

23   ***B. Analysis***

24   Both the state and federal Constitutions confer the right to a jury
trial on criminal defendants. (*People v. Sivongxxay* (2017) 3 Cal.5th
25   151, 166 (*Sivongxxay* ).) "Although trial by jury is a fundamental
constitutional right, a criminal defendant may waive the right."
26   (*People v. Cunningham* (2015) 61 Cal.4th 609, 636 (*Cunningham*
).) However, "'a defendant's waiver of the right to jury trial may not
27   be accepted by the court unless it is knowing and intelligent, that is,
" ' "made with a full awareness both of the nature of the right being
28   abandoned and the consequences of the decision to abandon it," ' "
as well as voluntary " ' "in the sense that it was the product of a

free and deliberate choice rather than intimidation, coercion, or deception." ' " (*Sivongxxay*, *supra*, at p. 166.) "The denial of a defendant's constitutional right to a jury trial constitutes structural error that requires reversal regardless of the strength of the evidence supporting the conviction." (*People v. Jones* (2018) 26 Cal.App.5th 420, 429 (*Jones* ); *People v. French* (2008) 43 Cal.4th 36, 52, fn. 8; *People v. Collins* (2001) 26 Cal.4th 297, 311 (*Collins*).)

"'[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case.'" (*Sivongxxay*, *supra*, 3 Cal.5th at p. 166.) Thus, our caselaw does not mandate "any specific method for determining whether a defendant has made a knowing and intelligent waiver of a jury trial in favor of a bench trial. We instead examine the totality of the circumstances." (*Id.* at p. 167.) More specifically, a jury waiver is valid " ' "if the record *affirmatively* shows that it is voluntary and intelligent under the circumstances." ' " (*People v. Daniels* (2017) 3 Cal.5th 961, 991 (*Daniels*) (lead opn. of Cuéllar, J.); accord, *id.* at p. 1018 (conc. and dis. opn. of Corrigan, J.; *Collins*, *supra*, 26 Cal.4th at p. 310.)

Recently, in *Sivongxxay*, our Supreme Court provided "general guidance to help ensure that a defendant's jury trial waiver is knowing and intelligent, and to facilitate the resolution of a challenge to a jury waiver on appeal." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) Noting that its guidance was "not intended to limit trial courts to a narrow or rigid colloquy," the Supreme Court nonetheless clarified: "Going forward, we recommend that trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence. We also recommend that the trial judge take additional steps as appropriate to ensure, on the record, that the defendant comprehends what the jury trial right entails. A trial judge may do so in any number of ways—among them, by asking whether the defendant had an adequate opportunity to discuss the decision with his or her attorney, by asking whether counsel explained to the defendant the fundamental differences between a jury trial and a bench trial, or by asking the defendant directly if he or she understands or has any questions about the right being waived. Ultimately, a court must consider the defendant's individual circumstances and exercise judgment in deciding how best to ensure that a particular defendant who purports to waive a jury trial does so knowingly and intelligently." (*Id.* at pp. 169-170; see *United States v. Shorty* (9th Cir. 2013) 741 F.3d 961, 966 (*Shorty* ) [noting that courts have a " 'serious and weighty' " responsibility to determine whether a waiver is knowing and intelligent, and identifying the same four factors for federal district courts to address in jury trial waiver colloquy as *Sivongxxay* identified for California trial courts], quoting *Johnson v. Zerbst* (1938) 304 U.S. 458, 465.)

14

*Sivongxxay* held the defendant's jury trial waiver was knowing and intelligent where the trial court advised "that he had a right to a jury trial, that a jury consists of 12 people from the community, that he would have the right to participate in the selection of the jury, and that waiver of the right to a jury would mean the judge alone would determine his guilt or innocence and any resulting punishment." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167.) The *Sivongxxay* court found significant the fact that the defendant "had prior experience with the criminal justice system, having pleaded guilty to two prior offenses in Oregon and one in Washington State," and, "in connection with his guilty plea in Washington, [had] signed a waiver stating that he 'fully under[stood]' his right to a jury trial." (*Ibid.*) *Sivongxxay* concluded: "Viewed holistically, the circumstances surrounding defendant's jury waiver demonstrate that it was knowing and intelligent." (*Id.* at p. 168.)

*Sivongxxay* rejected the argument that the defendant's jury waiver was deficient because the trial court did not explain that a jury must be impartial and render a unanimous verdict, noting, " '[T]he United States Supreme Court has never held that a defendant, when waiving the right to a jury, constitutionally is entitled to be canvassed by the trial court, let alone to require a specifically formulated canvass' [citations], and we have never insisted that a jury waiver colloquy invariably must discuss juror impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 168, fn. omitted; accord, *Daniels*, *supra*, 3 Cal.5th at pp. 992-993 (lead opn. of Cuéllar, J. ["We continue to eschew any rigid rubric for trial courts to follow in order to decide whether to accept a defendant's relinquishment of this right."]; *id.* at p. 1018 (conc. and dis. opn. of Corrigan, J.) ["We have consistently eschewed any rigid formula or particular form of words that a trial court must use to ensure that a jury trial waiver is knowing and intelligent."].)

Following *Sivongxxay*, two published Court of Appeal cases reversed convictions on grounds that the jury trial waiver entered by the respective defendant in each case was not knowing and intelligent. *People v. Blancett* (2017) 15 Cal.App.5th 1200 (*Blancett*), considered whether the defendant in a mentally-disordered-offender recommitment hearing knowingly and intelligently waived his right to a jury trial. In *Blancett*, the defendant's attorney represented to the trial court that the defendant was " 'okay' " with having the judge, not a jury, decide the issue of guilt; the trial court then simply inquired, " 'That's okay with you?' " and the defendant responded, " 'Yes, your honor.' " (*Id.* at p. 1203.) The Court of Appeal concluded that his waiver was "not knowing and intelligent" (*id.* at p. 1207) because he "did not waive his right to a jury trial with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." (*Id.* at p. 1206.) Specifically, the trial court did not advise the defendant that he was entitled to a jury trial or "explain the significant attributes or mechanics of a jury trial. [Citation.] Neither did the court inquire whether [the defendant] had sufficient opportunity to discuss the decision with his attorney, whether his

attorney explained the differences between a bench trial and a jury trial, or whether [the defendant] had any questions about the waiver." (*Ibid.*) Furthermore, the defendant had no prior experience with this type of proceeding and the record did not show he was aware he was entitled to a jury trial. (*Ibid.*)

In *Jones, supra,* 26 Cal.App.5th 420, the Court of Appeal summarized the record pertinent to the defendant's jury trial waiver as follows: "The record shows that [the defendant] had some discussion with her attorney before the waiver was taken in that it was her attorney who indicated to the trial court that [the defendant] wanted to waive her right to a jury trial. However, the record does not show whether [the defendant's] attorney ever discussed with her the nature of a jury trial, including for example, that the jury would be comprised of 12 of her peers from the community. Further, the trial court did not specifically advise [the defendant] that she had a right to a jury trial, instead only asking her, 'do you understand your right to a jury trial?' She responded, 'Yes, sir.' The only real advisement by the trial court was that, as a result of [the defendant's] waiver, the trial judge 'sitting alone' would 'decide the case.' [She] agreed, again responding, 'Yes, sir.'" (*Id.* at p. 435.)

The question before the *Jones* court was "whether this sparse record ' " '*affirmatively* show[ed] that [the waiver was] voluntary and intelligent under the totality of the circumstances.' " ' " (*Jones, supra*, 26 Cal.App.5th at p. 435.) *Jones* found the record did not show the defendant "understood the nature of the right to a jury trial she was relinquishing," and, in addition, the trial court did not "take steps to ensure that she 'comprehend[ed] what the jury trial right entails.'" (*Id.* at p. 436.) *Jones* noted the case was "similar to *Blancett*, in which the trial court's entire inquiry was whether the defendant was 'okay' with having his case decided by a judge instead of a jury." (*Jones, supra*, at p. 437.) *Jones* observed: "The additional statement by [the defendant] that she understood her right to a jury trial does not change the fact that, as in *Blancett*, [she] 'did not waive [her] right to a jury trial with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it.'" (*Jones, supra*, at p. 437.) *Jones* concluded the record did not "'*affirmatively* show'" that the defendant's waiver was "'voluntary and intelligent'" under the totality of the circumstances. (*Id.* at p. 437.)

Turning to the instant case, the record shows that counsel had discussed the possibility of waiving jury trial with the defendant on the morning of the scheduled jury trial in the matter. Subsequently, however, the trial court specifically informed Corral: "You have the right to a jury trial. That is, you have the right to have the People prove the truth of the charges beyond a reasonable doubt to a jury of 12 individuals selected from within this community, and they would decide, with the presumption of innocence in mind, whether you are guilty beyond a reasonable doubt of the truth of the charges based only on evidence presented inside of this courtroom." The court then asked Corral, "Do you understand that right?" and Corral responded, "Yes, sir." The court also advised Corral that were he to waive his right to a jury trial, "the People would have to prove the

truth of the charges beyond a reasonable doubt with the presumption of innocence being applied to a court, and the judge would make the decision as the fact finder in the case, not the jury." The court then asked, "Do you understand that?" and Corral responded affirmatively. The court also explained that at both a jury trial and a court trial, Corral would have the rights to have an attorney represent him, confront witnesses against him, subpoena his own witnesses, and to testify or not (as he chose). Finally, the court took a recess, so Corral could further discuss the issue with his attorney and subsequently confirmed whether Corral had enough time to talk to his attorney (Corral said he had sufficient time). The court then took an express waiver of the right to a jury trial from Corral.

In sum, the court ensured that Corral had the time he needed to talk to his attorney about a potential jury trial waiver and, subsequently, the court itself advised Corral he was entitled to a jury trial and provided critical information about what a jury trial entails. At the same time, the court did not inform Corral about his right to participate in the jury selection process, the impartiality and unanimity requirements that apply to jury trials, the consequences of jury deadlock, and the loss of an independent reevaluation of a jury verdict by the judge. (See, e.g., *People v. Collins* (1976) 17 Cal.3d 687, 693 ["Among the essential elements of the [California constitutional] right to trial by jury are the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous."].) Nor did the court confirm that counsel had discussed these points with Corral and that counsel supported Corral's decision to waive jury trial. In addition, Corral had no prior experience with the criminal justice system (as confirmed in the probation report). (*Daniels*, *supra*, 3 Cal.5th at p. 1023 (conc. and dis. opn. of Corrigan, J. [fact that self-represented defendant had pleaded guilty on three prior occasions after receiving advisement to effect "that he could not be convicted unless all 12 jurors agreed [he was guilty]" supported a finding that his instant jury trial waiver was valid without such an advisement.) Furthermore, as the court was aware, the question of Corral's competency to stand trial had arisen in this case, requiring the temporary suspension of criminal proceedings until the court determined Corral was competent for purposes of going to trial.[4] (*Shorty*, *supra*, 741 F.3d at pp. 966-967 [noting that " 'in-depth' " and comprehensive colloquy is required when there is evidence of "mental or emotional instability," and finding invalid jury trial waiver where the defendant had low IQ and learning disability and trial court only advised him that a jury consists of 12 people and, upon waiver, court would try case].) However, other than generally referencing the competency proceedings, Corral does not elaborate on any impairments that may have affected his ability to knowingly and intelligently waive his right to trial by jury.

[4] Corral was examined by three psychologists. One found him incompetent to stand trial but two found him competent for this purpose.

17

Although the trial court did not give the complete advisement recommended in *Sivongxxay*, in the end this case is closer, on the facts, to *Sivongxxay*, than it is to *Blancett* or *Jones*. The court told Corral: "You have the right to a jury trial. That is, you have the right to have the People prove the truth of the charges beyond a reasonable doubt to a jury of 12 individuals selected from within this community, and they would decide, with the presumption of innocence in mind, whether you are guilty beyond a reasonable doubt of the truth of the charges based only on evidence presented inside of this courtroom." The court then asked Corral, "Do you understand that right?" Corral answered: "Yes, sir." Taking into account the totality of the circumstances, including the fact that Corral was represented by competent counsel, we find that Corral's waiver of his jury trial right was knowing and intelligent. (See *United States ex rel. Williams v. DeRobertis* (7th Cir. 1983) 715 F.2d 1174, 1180 [upholding jury trial waiver where the defendant "understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge"]; *People v. Wrest* (1992) 3 Cal.4th 1088, 1105 [upholding jury trial waiver where defendant was advised that unanimous verdict of jury of 12 peers, selected by court and counsel, was necessary to convict but rejecting argument that, for valid waiver, court was required to ensure that defendant understood " 'all the ins and outs' of a jury trial"]; *People v. Acosta* (1971) 18 Cal.App.3d 895, 902; *cf. Collins*, *supra*, 26 Cal.4th at p. 305 [knowing and intelligent jury trial waiver is one " ' " 'made with a *full awareness* both of the nature of the right being abandoned and the consequences of the decision to abandon it' " ' " (italics added) ].)

(Doc. 13-8 at 6-13).

## 2. Analysis

The Sixth Amendment[3] right to a jury trial conferred by the Constitution and incorporated against the States by way of the Fourteenth Amendment "is waivable, so long as the waiver includes the consent of the government counsel, the sanction of the court, and the 'express and intelligent consent of the defendant.' " *see also Crosby v. Schwartz*, 678 F.3d 784, 788 (9th Cir. 2012) (quoting *Patton v. United States*, 281 U.S. 276, 312 (1930), *overruled on other grounds by*

---

[3] The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence.

18

1    *Williams v. Florida*, 399 U.S. 78, 92 (1970)); *see also Patton v. United States*, 281 U.S. 276

2    (1930).  A waiver is knowing and intelligent "if the defendant fully understands the nature of the

3    right and how it would likely apply *in general* in the circumstances—even though the defendant

4    may not know the *specific detailed* consequences of invoking it."  *United States v. Ruiz*, 536 U.S.

5    622, 629 (2002).

6         Here, the record reflects that Petitioner discussed the waiver with his counsel before the

7    proceedings; the trial court expressly advised Petitioner that he had a right to be tried by a jury of

8    twelve individuals who would have to find him guilty beyond a reasonable doubt; Petitioner

9    stated he understood that right; the trial court then permitted Petitioner additional time to again

10   discuss the waiver with his counsel; and the trial court confirmed Petitioner wished to waive his

11   right to a jury trial.  In these circumstances, it was not unreasonable for the state appellate court to

12   conclude Petitioner's waiver was both knowing and intelligent.

13        Petitioner attempts to rebut this conclusion by arguing the court erred in not informing

14   him of additional aspects of a jury trial, including that he would be allowed to participate in

15   selecting the jury and that any verdict would have to be unanimous.  Petitioner cites *United States

16   v. Shorty*, 741 F.3d 961, 966 (9th Cir. 2013), wherein the Ninth Circuit concluded that where a

17   "defendant's mental or emotional state is a substantial issue," a district court was required[4] to

18   conduct an in-depth colloquy informing the defendant of four facts for the defendant's waiver of a

19   jury trial to be valid.  The four facts are: (1) twelve members of the community compose a jury;

20   (2) the defendant may take part in jury selection; (3) jury verdicts must be unanimous; and (4) the

21   court alone decides guilt or innocence if the defendant waive a jury trial.  *Id.*

22        First, there is no evidence that Petitioner's mental state was at issue.  Instead, the record

23   reflects he was found competent to stand trial.  Moreover, Petitioner fails to cite any Supreme

24   Court case imposing the same requirements as *Shorty*, such that the *Shorty* requirements are not

25   clearly established, federal law for the purpose of granting habeas relief.  *See Marshall v.*

26

---

27   [4] In cases where the defendant's mental or emotional state are not at issue, the Ninth Circuit
     recommends but does not require, district courts to inform defendants of the "four crucial facts."
28   *Shorty*, 741 F.3d at 966.

1   *Rodgers*, 569 U.S. 58, 64 (2013) (rejecting the idea that "circuit precedent may be used to refine

2   or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the

3   Supreme] Court has not announced" for purposes of habeas relief). Indeed, there could not have

4   been a jury-unanimity mandate by the Supreme Court since the Supreme Court did not even adopt

5   a jury-unanimity rule until its decision in *Ramos v. Louisiana*, 590 U.S. 83 (2020), well after

6   Petitioner's conviction. In sum, while Petitioner argues he should have been advised of

7   additional components to his right to a jury trial, advisement of such components to obtain a

8   knowing and voluntary waiver of a defendant's right to a jury trial are not constitutionally

9   mandated. *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) (rejecting that failure to

10  appraise defendant of all facets of jury trial, including unanimity or fact that defendant may take

11  part in jury selection process, made defendant's waiver of jury trial unintelligent or unknowing).

12      Consequently, the undersigned finds that the state appellate court's rejection of

13  Petitioner's jury waiver claim was not contrary to, or an unreasonable application of, clearly

14  established federal law, nor was it based on an unreasonable determination of the facts in light of

15  the evidence presented in the State court proceeding and recommends that ground one be denied.

16      **B.    Ground Two-*Miranda* Violation**

17      In ground two, Petitioner argues the admission of statements he made to Deputy Colbert

18  violated his right against self-incrimination because he did not receive *Miranda* warnings at any

19  point during questioning. (Doc. No. 1 at 65-66). Petitioner argues the circumstances surrounding

20  the questioning weigh in favor of finding he was in custody such that the lack of *Miranda*

21  warnings precluded the admission of his statements at trial. (*Id.* at 79-86).

22      Respondent argues the state court's decision that *Miranda* warnings were not necessary

23  for Petitioner's initial confession and that the admission of any subsequent statements was

24  harmless is not an unreasonable application of federal law. (Doc. No. 14 at 41-42). Additionally,

25  Respondent argues that "even if the state court somehow got the *Miranda* issue wholly wrong—

26  such that *none* of Petitioner's statements should have been admitted, not even what the state court

27  called his 'initial confession'—the Court should still find the entire error harmless" because "the

28  other evidence of Petitioner's responsibility for the rapes was so strong that it cannot be said that

1    admitting any of his statements had 'substantial and injurious effect or influence in determining

2    the [fact-finder's] verdict.'" (*Id.* at 43).

3                    **1.    State Court Decision**

4        In denying Petitioner's *Miranda* claim, the Fifth Appellate District court found as follows:

5
6    **II. Necessity of *Miranda* Warnings During Corral's Police
     Interrogation**

7
     Corral argues his convictions must be reversed because the trial court
8    prejudicially erred in admitting the confession he gave to police. He
     contends his statement to the police was inadmissible because he was
9    never given *Miranda* advisements despite being subjected to custodial
     interrogation. He suggests that even if the "interrogation ... was not
10   custodial at the outset, it became custodial" once he admitted certain
     details related to the crimes. We conclude the trial court properly
11   admitted Corral's initial confession to the police, as the interrogation
     was not custodial up to and including the point when the initial
12   confession was made. We need not decide whether the interrogation
     became custodial after that point and, in turn, whether Corral's
13   subsequent statements were inadmissible as the product of a custodial
     interrogation, because admission of these statements was, in any event,
14   harmless beyond a reasonable doubt.

15   *A. Background*

16   Corral moved, in limine, for an Evidence Code section 402 hearing to
     determine the admissibility of his statements to Deputy Colbert at the
17   Lamont substation. After the case was set for a bench trial, the court
     denied Corral's in limine request, noting it would consider the
18   admissibility of Corral's police statements when that evidence was
     presented. The court clarified: "[I]f there is a motion to strike or
19   foundation is not satisfactorily laid, then the Court will exclude all
     reference to defendant's statements."

20   Thereafter, during the trial testimony of Deputy Dunshee, the
21   prosecutor played the recording of Dunshee's interaction with Corral at
     the Arvin Police Department, where Corral had come to turn himself
22   in to police. The prosecutor clarified that this evidence was
     foundational only: "This recording is being offered for the *Miranda*
23   issue so we are clear on that." When Deputy Colbert subsequently
     testified that he questioned Corral in a room at the Lamont sheriff's
24   substation, the prosecutor advised the court she was "going to play the
     recording" of that encounter. Defense counsel objected on "Fifth
25   Amendment grounds." The court reserved its ruling on the
     admissibility of the statement until after the recording was played and
26   Colbert had finished testifying. Ultimately, the court ruled: "[T]he
     Court is going to find that *Miranda* advisals were not necessary [here]
27   and that the People can use the statements attributable to the defendant
     in their case-in-chief."

28   ////

                                    21

1

2

**1. Testimony of Deputy Dunshee and Recording of his Interaction with Corral**

3

4

5

6

7

8

Deputy Dunshee testified that, upon notification from Arvin Police Department that a person had turned himself in with regard to the instant rape incident, Dunshee was dispatched to transport the person to the sheriff's Lamont substation. Dunshee met Corral, Corral's mother, and an Arvin police sergeant, in the lobby of the Arvin Police Department. Corral was not in restraints. Dunshee transported Corral to the Lamont substation in the backseat of his patrol car. Although Corral was not handcuffed, the backseat was cut off from the front of the car by a cage. Furthermore, the back doors of the patrol car did not have interior door handles, so even if Corral had wanted to get out, he could not have done so.

9

10

11

12

Dunshee testified that he turned his recorder on before entering the Arvin Police Department. As stated above, the prosecutor played the recording for purposes of laying a foundation for admitting Corral's subsequent interrogation by Deputy Colbert at the Lamont substation. The recording reflected the following exchange between Dunshee, Corral, and Corral's mother:

13

"[DUNSHEE]: Uh, you wanna turn yourself in? Okay, Do you wanna come with me in my car and we'll take you over to the Lamont Substation and we'll have a little chat?

14

15

"[CORRAL]: Yeah. Um....

"MOTHER: (But) what are you going to do to him?

16

17

"[CORRAL]: (He's arresting me now). [Corral and his mother were conversing in Spanish.]

18

"[DUNSHEE]: I'm sorry, ma'am?

19

"[CORRAL]: He's arresting me now.

20

"MOTHER: Why?

21

22

"[CORRAL]: Because he wants to investigate me and talk to me and – and everything else.

"MOTHER: Yes. But I want him to explain to me.

23

24

"[CORRAL]: Um, she wants you to explain what's gonna happen.

25

26

"[DUNSHEE]: I – I don't even know what's goin' on right now. I'm just told to come over here and pick you up. [¶] ... [¶] ... We – you want me to take mom's phone number? I can call her and let her know what's going on later.

27

"[CORRAL]: Yeah.

28

"[DUNSHEE]: Okay. In case she needs to pick you up from Lamont

22

or we can give you a ride back if we need to.

"[CORRAL]: I don't think I'm gonna come back.

"[DUNSHEE]: Oh. Well, we – we don't know what's goin' on yet, so let's – let's...

"[CORRAL]: Well, I know what's goin' on and I ...

"[DUNSHEE]: Do y...

"[CORRAL]: ... know the truth and I'm not gonna lie."

The recording also indicated that Dunshee patted Corral down before placing him in the patrol car. Corral said he had "left everything [at] home," including his wallet, keys, and cellphone. As Dunshee prepared to leave, someone from the Arvin Police Department advised Dunshee that Corral "said he drives a red Ford – Ford Focus." Dunshee responded, "I already have a deputy out at the house right now." Dunshee added: "We have TI goin' out to [process the car]." Thereafter, upon arriving at the Lamont substation, Dunshee opened the door for Corral and then led him into the substation, directing him to an interrogation room within.

**2. Testimony of Deputy Jeffrey Colbert**

Deputy Jeffrey Colbert testified that he became involved in the investigation into the rapes when he was notified by his sergeant that "a double rape had occurred and deputies from the night shift were following up on it as much as they could." Colbert further testified: "I met with the deputies, basically got a debrief of the incident that occurred so that I could assume it and take it over. I spoke to Deputy Phan, who had told me per the victims [that] the meeting between the suspect and the victims had been arranged through Facebook."

Colbert and Phan then identified the Facebook account used to arrange the meeting and did "a records check on the owner of the Facebook account." Colbert explained the owner of the Facebook account was a "14- or 15-year-old juvenile, [Ruby], who at the time was incarcerated at Juvenile Hall and had been since ... March 5." Colbert met Ruby at juvenile hall; Ruby gave him access to her Facebook account. Colbert accessed Ruby's Facebook account and viewed the "messages attempting to meet Ashley and her friend." Ruby also identified the person who sent the messages to Ashley from Ruby's account. Specifically, Ruby said "she ... believed it was a subject by either the name Mike or Michael that lived in Arvin and that she had used his phone to log on to her account in the past." Ruby said that Mike drove a red two-door hatchback. She also described Mike's profile picture to Colbert; she said it depicted Mike sticking out his tongue. Colbert then looked through Ruby's Facebook messages to identify messages with that particular profile picture. In addition, Colbert contacted another "female," Julie, whose name and contact information Ruby had given him, because Julie knew Mike. Colbert obtained a phone number for Mike from Julie. In short, Colbert was looking for a "Mike or Michael using a certain phone number driving a red car that lived in Arvin."

1

2    At that point, Colbert was contacted by the Arvin Police Department
     with news that a man had turned himself in for the rapes. Colbert
3    testified: "I was the one who received the information, and I started,
     for lack of better words, directing traffic on what to do to prep for the
4    next step." Colbert obtained Corral's name and date of birth from the
     Arvin Police Department. He also pulled a photograph of Corral,
     prepared a photo lineup, and sent Deputy Phan to have the girls
5    identify Corral from the photo lineup. Colbert also had a deputy write
     up search warrant applications to search Corral's house and car (as
6    well as one for a sexual assault examination on Corral's person).

7    At the same time, Colbert sent Deputy Dunshee to collect Corral from
     the Arvin Police Department. Colbert testified: "When I had sent
8    Deputy Dunshee to Arvin Police Department with the directions that I
     gave him, I also sent Deputy Pineda to secure and maintain the
9    vehicle, assuming it was at Arvin [Police Department]. He received
     information that it was on Walnut – I believe it is 2** Walnut. So he
10   then responded there and secured the vehicle. I – he let me know he
     was there. And I told him to secure both the residence and the vehicle
11   and let the people know that there was a search warrant pending."
     Colbert clarified: "I told [Pineda] to ... have the people step out [of the
12   residence] and secure it and hold it until a search warrant was there."
     Colbert continued: "[The search warrant] was in the process of being
13   written. That was one of the things – once dispatch let us know he
     went to Arvin [Police Department], I started directing traffic, like I
14   said, and there was a lot of things getting done."

15   Colbert summarized his actions: "From the time – I was made aware
     of [Corral's] being at Arvin [Police Department], and his name and
16   date of birth, which is all I needed, were given. I started with a photo
     lineup. After the photo lineups were done, I continued to direct the
17   deputies on duty, one to do a search warrant, one to secure the vehicle,
     one to go get him, and one to – because Deputy Phan had already
18   basically built a rapport with the victims, I told him to go get the
     [identifications]."
19
     When Corral walked into the Lamont substation with Deputy Dunshee,
20   Colbert saw him on the monitor. Colbert testified: "[He] matched the
     description of the multiple people I talked to based on the Facebook
21   description. The physical build matched. The gender, the race
     obviously. I believe the hair would have been an issue just based on
22   the victims, but he had short black hair." Colbert further testified: "I
     had obtained enough probable cause to conduct an investigative search
23   of the vehicle of – I was planning on seizing any evidence and things
     like that. The search warrant was pretty much bought and paid for
24   before he got to the substation. It had not been executed, and I had not
     interviewed him yet." A warrant for a sexual assault exam on Corral's
25   person was also obtained. However, Colbert testified that, at this point,
     he did not definitively know that Corral was the person who had raped
26   the girls.

27   After conducting all the foregoing preparations, Colbert questioned
     Corral in the interrogation room where the latter had been waiting for
28   30 minutes. At no time during the questioning did Colbert give Corral

a *Miranda* advisement. On cross-examination, Colbert gave somewhat conflicting answers on the question whether Corral was free to leave during the questioning, given all the information that Colbert had gathered about the case. Defense Counsel and Colbert had the following exchange:

"Q. Okay. So you meet this guy. He matches the physical description. He gives you the same name of the individual you are looking for. He drives the same kind of car. You already take steps to seize the vehicle, and you are informed by dispatch that the suspect in the rape case has turned himself in; right?

"A. Yes, sir. [¶] ... [¶]

"Q. Okay. So would it be fair to say, from the moment at least that the defendant starts admitting faking a Facebook account matching the description, having the same name, having the same kind of car, and being told that he is the suspect in the rape case, he was not free to leave?

"A. At the time, sir, I had not made the 100 percent decision to make an arrest.

"Q. Sir, I am just asking for a yes or no answer. Was he free to leave from the moment he starts talking about faking a Facebook account, which matches what Ruby had or the investigation that you had already conducted into this fake Facebook account?

"A. He was free to leave as far as my interview went. As far as – if the search warrant [for a sexual assault exam] was done and I needed to get a swab from him and if he would have said, 'Hey, I need to leave,' of course I would have detained him pursuant to the search warrant. But as far as my interview, I had not decided to arrest him. So if he would have said, 'Yeah, I want to leave,' then absolutely he could have left.

"Q. So even though he matched the same name, same description, same kind of car, started talking about faking a Facebook account, you would have let him walk out the door?

"A. Without the positive [identification] from the victims, yes.

"Q. And from the moment he starts telling you that he violated girls, used that term 'violated girls,' you'd still let him walk out the door?

"A. Again, sir, without the – I've made the mistake of jumping the gun and not submitting with all the evidence. I had not made the decision. And, again, if – unless the girls had identified, I was not going to make the arrest that night.

"Q. Not talking about an arrest.

"My question is would you have detained him in custody?

"A. If the search warrant – I mean, there's a couple different variables.

25

1   If the search warrant was done, I would have detained him to get what
    I needed pursuant to the search warrant. Again, if it wasn't, I would
2   have had to have tracked him down later, and if he wanted to leave, he
    could have left."
3
    **3. Recording of Corral's Police Interrogation**
4   When Colbert entered the interrogation room where Corral was sitting,
    he started off by asking Corral his name, date of birth, current address,
5   and cell phone number. When Corral hesitated in giving his cell phone
    number, Colbert said: "I know you [have a cell phone number] so just
6   go ahead." Corral provided the phone number. Colbert continued with
    asking Corral's social security number, whether he was working, and
7   whether and where Corral was a student. Colbert then asked what car
    Corral drove, what color it was, who bought it, and to whom it was
8   registered.

9   Thereafter, Colbert stated that he knew that Corral had voluntarily
    turned himself in at Arvin Police Department to talk about "something
10  bad" that he had done. He added: "I've been workin' on [the] case
    pretty much all day so if I ask you a couple of things I – or, lot of stuff
11  I'm gonna ask you I kind of already have an idea. I'd love to get your
    side of the story. I mean you – you turn – you went to Arvin [Police
12  Department] on your own. Nobody brought you there or whatever."
    Corral responded: "[W]ell it all started yesterday, um, in the morning,
13  um, I find out that one of the girls['] accounts [i.e., Ruby's account]
    was open on Facebook. And her account was open so I just faked it,
14  you know, faked being her." Corral added: "Um, told 'em [i.e., Natalie
    and Ashley] that if they wanted to hang out and they said yeah. And I
15  picked 'em up. We were gonna go to a party. But nothing happened.
    So I just took 'em out somewhere far and then I – well, they said I just
16  proceed in – in violating them." Corral confirmed: "Well I violated
    them. I raped 'em." Corral said the place he took the girls had a pool
17  and a private gym. Corral said he had "never seen [the girls] before."
    Corral said he was "fucked up in the head" and would hear voices,
18  almost as if he were "[d]ouble thinking [his] own voice," and
    "need[ed] somebody to talk to."
19
    At one point Colbert asked: "You said – you said kind of vaguely you
20  – you violated them. What happened?" Corral responded: "I raped
    'em." Colbert followed up: "Okay. I understand you raped 'em. I mean
21  what went down? Did you ... [¶] ... [¶] ... Did you have a weapon on
    you?" Corral responded: "A knife." Colbert asked: "What kind of
22  knife?" Corral explained: "Um, it's just those, um, sharp knives. It's
    just made for like couple uses. It's like – it was blue and it just has
23  little one end sharpened." Colbert asked: "What, kind of like a throw
    away knife, like just disposable knife?" Corral answered: "Yeah just
24  throw disposables. Yeah."

25  Colbert then walked Corral through the details of what had occurred
    by asking specific, step-by-step questions. Corral told him that he took
26  out the knife and told the girls to "take off their clothing." One of the
    girls passed out but the other girl took off her clothing. Corral had
27  been drinking and kept drinking during this time; he was already drunk
    but "kept drinking even more." At one point the other girl woke up;
28  Corral told her to take off her clothing and "proceeded to rape her."

Colbert asked whether Corral ejaculated; Corral responded: "I don't know." Colbert asked whether Corral inserted his penis "in each one of their vaginas" or "in the anus[?]" Corral said: "I don't know on the first one. The second one I know I inserted." Colbert also asked: "Did you make 'em like give you a blow job or anything like that or do you remember?" Corral said, "[the first one] just kept doing everything" and "it just felt like she was doing it on her own." Afterwards, Corral threw up over and over again. He said: "And then I woke up and I don't – I don't – I didn't see 'em around anymore. I didn't see 'em in the car."

Colbert asked: "Did [the girls] leave anything behind in the red car?" Corral told him they had left a bag behind. Colbert asked: "Did you take one of the girls' cell phones?" Corral responded: "I don't even know." Colbert asked where Corral's phone was, whether Corral had a Facebook account, and what his profile picture looked like. Corral answered that his phone was in his room at home, he did have a Facebook account, and his profile picture showed him "stickin' out [his] tongue."

Colbert then advised Corral: "Okay. Now couple things you said, and I'm gonna kind of go back just because I've been talkin' to people all day. Um, I've been doin' this, nothin' but this since early, early this morning. [¶] ... Um, including talking to Ruby. I've already talked to Ruby. I've been on her Facebook. I've been on her Facebook all day. Um, this didn't just happen yesterday as far as getting on her Facebook right? You've been doin' it for over a month." Corral denied being on Ruby's Facebook previously, insisting, "I just – I just barely found out yesterday in the morning." Colbert asked Corral: "How did – how did you get on Ruby's Facebook?" Corral replied: "It just opened on my phone." Corral explained that Ruby had used his phone to access her account on a previous occasion. Colbert asked what kind of cell phone Corral had and whether it was password protected; Corral advised him of the type of phone and confirmed it was not password protected. Colbert asked whether the knife was still in Corral's car and Corral confirmed it was. Colbert asked what happened to the girls' stuff that was in the car; Corral said he had given a bottle of perfume to his little sister. Colbert asked whether Corral also had made the girls drink the Four Lokos beer but Corral could not remember.

Colbert concluded: "Okay I think that's all the questions I have for now unless you can think of anything. Um, I'll kind of explain to you what happens dude. Um, right now because it's pretty serious ... [¶] ... um, what I do is I, um, search warrants will be written okay? 'Cause I can – I need your phone. And we're gonna search your car very well. They also do what's called, um, a sexual assault exam on you, which means they just, you know, take some swabs and examine you, stuff like that. And all that kind of junk." Colbert confirmed Corral had not changed his clothes or taken a shower. Colbert eventually stepped out of the room, explaining that he needed to talk to "some people outside" and telling Corral to "kick back [but] don't mess around."

When Colbert came back into the interrogation room, he said: "Ok. Uh – so you're here 100% purely voluntary right? You went to Arvin [Police Department] purely voluntarily. We picked you up ... and you

were cool with that, right?" Corral did not say anything in response to the questions but appeared to nod, as reflected in the video recording of the interrogation. Colbert then asked Corral, "Ok. So same shorts, same underwear you were wearing this morning?" Corral responded, "I don't even know." Colbert concluded: "OK, Michael. Go ahead and stand up man. OK. I appreciate you comin' down here. And uh – right now you are under arrest ok for um – the two rapes and uh – contributing to the delinquency of a minor basically providing alcohol to a minor. Um – you're gonna be taken to the exam – that's being done by a search warrant so if you don't cooperate then they're just gonna force you to do it. I know you're not – I know you're gonna be cooperative because you've been cool the whole time." Colbert added: "Um – I can talk to you up [until] they appoint you an attorney so if you think of anything else that you wanna talk to me again, feel free. Um – He's gonna put some handcuffs on you because you are going in the car and you are under arrest."

At no point did Colbert provide a *Miranda* advisement to Corral.

**B. Analysis**

In *Miranda, supra,* 384 U.S. at page 444, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Thus, "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." (*Thompson v. Keohane* (1995) 516 U.S. 99, 107 (*Thompson* ); *Miranda*, *supra*, 384 U.S. at pp. 473-474; *People v. Nelson* (2012) 53 Cal.4th 367, 374 [" ' "In order to combat [the] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights" to remain silent and to have the assistance of counsel.' "].) Once *Miranda* warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." (*Smith v. Illinois* (1984) 469 U.S. 91, 98.)

*Miranda* warnings are required only when a suspect interrogated by the police is "'in custody.'" (*Thompson*, *supra,* 516 U.S. at p. 102; *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 (*Innis*) ["*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."].) Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, *supra,* 384 U.S. at p. 444; *People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*); *Innis*, *supra*, at p. 301 ["the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response."].) The relevant question for determining whether an interrogation is custodial is whether a

"reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." (*Thompson*, *supra*, 516 U.S. at p. 112.) Two separate determinations are required to resolve this question: (1) what were the circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person in the suspect's situation have felt free to terminate the interrogation and leave. (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 270 (*J.D.B.*); *Berkemer v. McCarty* (1984) 468 U.S. 420, 437-438, 442, fn. 36 (*Berkemer*) [since *Miranda* was concerned with coercion, a reviewing court must evaluate "custody" by examining the totality of the circumstances surrounding the limitations on the suspect's freedom as a reasonable suspect would perceive them].) These are objective inquiries. Thus, "'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." (*J.D.B.*, *supra*, at p. 270; *People v. Blouin* (1978) 80 Cal.App.3d 269 ["The test is not the subjective intent of the interrogator [citation], but rather whether the suspect was actually deprived of his freedom in any significant way or, as a reasonable person, was led to believe his freedom of movement was restricted by the pressures of official authority."].)

In order for an accused's statement, made during custodial interrogation, to be admissible at trial, police must have given the accused a *Miranda* warning. (See *Miranda*, *supra*, 384 U.S. at p. 471.) "If that condition is established, the court can proceed to consider whether there has been an express or implied waiver of *Miranda* rights." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 388.)

Here, it is undisputed that Corral was not advised of his *Miranda* rights when he was questioned by Deputy Colbert in the interrogation room at the Kern County Sheriff's substation. Similarly, there is no dispute, given the information provided to Colbert by the Arvin Police Department and Colbert's investigation and actions prior to questioning Corral, that Corral was interrogated, i.e., subjected to "express questioning or its functional equivalent" that the police should know was reasonably likely to elicit an incriminating response. (*Innis*, *supra*, 446 U.S. at p. 301; see *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera* ).) Therefore, the issue before us is whether Corral was "in custody" for *Miranda* purposes and, in turn, whether the statements he made to Deputy Colbert were inadmissible because of the lack of *Miranda* warnings.

Whether a person was "in custody" for the purposes of *Miranda* is a conclusion reviewed de novo. (*Thompson*, *supra*, 516 U.S. at pp. 112-113 ["custody" is a mixed question of law and fact].) "On appeal, [a reviewing court will] defer to the trial court's factual findings supported by substantial evidence and independently determine from the factual findings whether appellant was in custody for *Miranda* purposes." (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970; see *People v. Waidla* (2000) 22 Cal.4th 690, 730 ["An appellate court applies the independent or de novo standard of review, which by its nature is nondeferential, to a trial court's granting or denial of a motion to suppress a statement under *Miranda* insofar as the trial court's underlying decision entails a measurement of the facts against the law."].) The parties do not dispute the facts here (also, the

interrogation itself was video recorded), so our review is de novo. Finally, the prosecution bears the burden to prove that the defendant was not in custody, in order to use his statements against him. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)

The United States Supreme Court has stated that "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509 (*Fields*); see *Innis, supra,* 446 U.S. at p. 299 ["The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination."].) Further, as stated above, both our state high court and the United States Supreme Court have clarified that, in determining whether a defendant was in custody in this sense, we must examine the objective circumstances surrounding the interrogation to answer the question, " " 'would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " " (*Kopatz, supra,* 61 Cal.4th at p. 80, quoting *Yarborough v. Alvarado* (2004) 541 U.S. 652, 663 (*Yarborough*).) The United States Supreme Court has considered various relevant circumstances, (see *Fields, supra,* 565 U.S. at p. 509 (collecting cases) ), including: (1) whether the defendant voluntarily approached, accompanied, or agreed to meet with, the police (*California v. Beheler* (1983) 463 U.S. 1121, 1122 (*Beheler*); *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 (*Mathiason*); (2) the location of the questioning (*Maryland v. Shatzer* (2010) 559 U.S. 98, 105-106); (3) the duration of the questioning (*Berkemer, supra,* 468 U.S. at pp. 437-438); (4) statements made during the questioning (*Mathiason, supra,* at p. 495; *Yarborough, supra,* at p. 665; *Stansbury v. California* (1994) 511 U.S. 318, 325 (*Stansbury*); (5) the presence or absence of physical restraints during the questioning (*New York v. Quarles* (1984) 467 U.S. 649, 655); and (6) the release of the interrogee at the end of the questioning (*Beheler, supra,* at pp. 1122-1123; *Mathiason, supra,* at p. 495). Other courts have considered additional or alternative factors that may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators. (See *United States v. Beraun-Panez* (9th Cir. 1987) 812 F.2d 578, 580 (*Beraun-Panez*); *United States v. Kim* (9th Cir. 2002) 292 F.3d 969, 973-974 (*Kim*); *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403; *Aguilera, supra,* 51 Cal.App.4th at p. 1162.) All cases stress that no one circumstance is controlling, rather a reviewing court must look to the totality of the circumstances in deciding whether an individual was subjected to custodial interrogation under *Miranda*.

To determine whether the interrogation was custodial, we must first examine the circumstances surrounding the interrogation and then measure the circumstances against the objective legal standard: " ' "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." ' " (*Kopatz, supra,* 61 Cal.4th at p. 80, quoting *Yarborough, supra,* 541 U.S. at p. 663.) Here, Corral, along with his mother, voluntarily came to the Arvin Police Department, stating he had done something bad and wanted to talk to police about the rapes that had occurred earlier that day. However,

1

2

3

4

5

6

7

"[v]oluntary initiation of contact with the police cannot be, under any circumstances, the end of the inquiry into whether a defendant was 'in custody' during the encounter. If an individual voluntarily comes to the police station or another location and, once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial." (*Kim*, *supra*, 292 F.3d at p. 975.) United States Supreme Court cases relying on the voluntary initiation of the police encounter so indicate, "as none rely *solely* on [this] factor." (*Ibid.*; *People v. Saldana* (2018) 19 Cal.App.5th 432, 456 [defendant walked to police station on his own, but "voluntary contact with the police is only the beginning of the inquiry" in determining whether the subsequent questioning was custodial].)

8

9

10

11

12

13

14

15

16

17

18

19

20

*Mathiason* and *Beheler*, two federal Supreme Court cases, are instructive for purposes of our analysis, which requires us to assess whether, under the totality of the circumstances, Corral was subjected to custodial interrogation at the Lamont substation. In *Mathiason*, a police officer investigating a theft left his card at the defendant's apartment with a note asking him to call. The defendant, Mathiason, called the officer and, a short time later, the two met at the state patrol office, approximately two blocks from Mathiason's home. The officer met Mathiason in the hallway, took him to a room, and advised him that he was not under arrest. (*Mathiason*, *supra*, 429 U.S. at p. 493.) Mathiason admitted to the theft "within five minutes" of arriving at the office. (*Ibid.*) "The officer then advised [Mathiason] of his *Miranda* rights and took a taped confession." (*Id.* at pp. 493-494.) Thereafter, Mathiason was released "'to go about his job and return to his family,'" pending the district attorney's review of the matter. (*Id.* at p. 494.) Reversing the Oregon Supreme Court, the federal high court found Mathiason "was not in custody" or " 'otherwise deprived of his freedom of action in any significant way,' " when he initially confessed to the theft. (*Id.* at p. 495.) The federal high court found significant the fact that Mathiason "came voluntarily to the police station, where he was immediately informed that he was not under arrest." (*Ibid.*) The court also found significant the fact that "[a]t the close of a 1/2-hour interview[,] [Mathiason] did in fact leave the police station without hindrance." (*Ibid.*)

21

22

23

24

25

26

27

28

In *Beheler*, the defendant, Beheler, and several others attempted to steal some hashish from a drug dealer. One of the others shot and killed the dealer when she refused to relinquish her hashish. Shortly thereafter, Beheler called the police (who arrived immediately) and told them some details about the murder. Beheler voluntarily agreed to accompany the police to the station house. The police "specifically told Beheler that he was not under arrest." (*Beheler*, *supra*, 463 U.S. at p. 1122.) "At the station house, Beheler agreed to talk to police about the murder, although the police did not advise Beheler of the rights provided him under [*Miranda*]. The interview lasted less than 30 minutes. After being told that his statement would be evaluated by the District Attorney, Beheler was permitted to return to his home. Five days later, Beheler was arrested in connection with the [dealer's] murder." (*Ibid.*) Reversing the California Court of Appeal, the United States Supreme Court concluded that *Miranda* warnings were not necessary because "Beheler was neither taken into custody nor

significantly deprived of his freedom of action. Indeed, Beheler's freedom was not restricted in any way whatsoever." (*Id.* at p. 1123.)

Other cases helpful for our analysis are *United States v. Hayden* (9th Cir. 2001) 260 F.3d 1062 (*Hayden*), *United States v. Hudgens* (9th Cir. 1986) 798 F.2d 1234 (*Hudgens*), and *Saldana*, *supra*, 19 Cal.App.5th 432. In *Hayden*, the Ninth Circuit found that Hayden, a theft suspect, who appeared voluntarily and in her own transport for questioning at the local office of the Federal Bureau of Investigation (FBI), was not in custody for *Miranda* purposes when "she was told explicitly that she was free to leave at any time and would not be arrested on that occasion" and did, in fact, go home afterwards. (*Hayden, supra,* 260 F.3d at pp. 1063, 1064, 1066.) The *Hayden* court further noted, "[t]here is no evidence that Hayden was incapable of finding her way out of the FBI building or that her ability to leave was in any other way restrained. Nor is there any evidence that the duration of the [questioning] was excessive or that undue pressure was exerted on [her]." (*Id.* at pp. 1066-1067.)

Similarly, in *Hudgens, supra,* 798 F.2d 1234, the court found that Hudgens, the defendant, was not subjected to custodial interrogation when he called the FBI, asked to speak to the agent in charge of the robbery of a particular bank (that had been the target of multiple robberies), two agents drove out to meet him in a 7-11 parking lot, and spoke to him in their vehicle for 45 minutes. The *Hudgens* court reasoned: "Hudgens was not a suspect prior to the time he initiated the conversation with the agents. Hudgens was not physically restrained. There was no evidence of intimidation or coercion. The interrogation was conducted in a subdued low-keyed manner. Hudgens was not patted down, handcuffed, or physically restrained until after he made his statement." (*Id.* at p. 1236.)

In *Saldana*, *supra*, 19 Cal.App.5th 432, the court concluded that a police station interrogation, less than an hour long, regarding alleged sexual molestation was custodial, where the defendant voluntarily agreed to be questioned (calling back a detective who had left a card at his house and going to the police station by himself), was not handcuffed, was questioned by only one detective, and was told at the outset that he was not under arrest and was free to leave but was arrested minutes after leaving the station. (*Id.* at pp. 436-437, 457, 461.) The court found it significant that Saldana, the defendant, was questioned incommunicado in an interrogation room the door to which was closed, and that the detective, while maintaining a pleasant tone, "asked an unrelenting number of accusatory questions." (*Id.* at pp. 437, 438, 456, 457, 460 ["At the police station, " 'the investigator possesses all the advantages.' " "].) The *Saldana* court concluded, "the accusatory nature of the questioning ... objectively conveyed that Saldana was not free to leave." (*Id.* at p. 462.)

Here, several factors suggest that Corral's interrogation at the Lamont substation was not custodial, although, taken in context, the interrogation reflects some elements of coercion. Clearly, one of the more significant facts, for purposes of our analysis, is that Corral willingly sought out and initiated the encounter with the police and was relatively forthcoming about the details of the crimes. (See *Kim*,

*supra*, 292 F.3d at p. 974 ["If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter."].) Moreover, Colbert did not engage in aggressive or confrontational questioning that would overtly telegraph that Corral's freedom of movement was restricted; on the contrary, Colbert maintained a professional demeanor throughout and his tone was courteous. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1164 ["on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory"].) Finally, although Corral was in the interrogation room for an hour and a half, he was not in restraints and did not appear uncomfortable.

On the other hand, when Corral arrived at the Arvin Police Department, he was not simply directed to drive over to the sheriff's Lamont substation with his mother who, knowing the police were looking for Corral, had accompanied him to support him and was evidently his ride. (*Kim*, *supra*, 292 F.3d at p. 977 [" 'The Supreme Court in *Miranda* noted that separating a subject from others, who might lend moral support to a person questioned and thereby prevent inculpatory statements, was a technique of psychological coercion.' "]; *Beraun-Panez*, *supra*, 830 F.2d at p. 127 ["[b]y keeping [defendant] isolated from other people, the officers contributed to the custodial nature of the interrogation"].) After Dunshee arrived, Corral was patted down but not handcuffed and was transported in the backseat of an effectively locked patrol car. While Corral agreed to go with Deputy Dunshee, the manner and mode of his arrival at the Lamont substation, along with his prior knowledge that police were looking for him, would reasonably and objectively be expected to bear on his perception of his freedom of movement once there.

At the substation, Corral was placed in an interrogation room, the door to which was closed. Colbert entered after 30 minutes, shutting the door behind him. After asking some preliminary questions, Colbert noted that Corral was cooperating voluntarily but did not clarify that Corral was not under arrest and could leave at any time. Colbert told Corral, "I've been working on [the] case pretty much all day so ... [a] lot of stuff I'm gonna ask you I kind of already have an idea," and then asked him to tell his side of the story. Corral quickly confessed to using Facebook to contact the girls, picking them up, and then raping them at a private gym facility. Corral clearly confessed to very serious crimes against two minor victims, and courts have recognized that " " '[t]he awareness of the person being questioned by an officer that ... the police have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom.' " " (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.)

After Corral confessed, Colbert proceeded to asked him detailed and precise questions about how the crimes were perpetrated. At one point, Colbert informed Corral that Colbert had been working intensively on the rape investigation, had spoken to Ruby and others, and had "been on [Ruby's] Facebook all day." Colbert then asked Corral about specific posts on Ruby's Facebook page. (See *Stansbury, supra,* 511

U.S. at p. 325 ["An officer's knowledge ... may bear upon the custody issue if [it is] conveyed, by word or deed, to the individual being questioned.... [That knowledge is] relevant only to the extent [it] would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her '"freedom of action."'"].) In addition, at the end of the questioning, Corral was arrested and taken for a sexual assault examination.

Taking into consideration the totality of the circumstances, we conclude Corral was not in custody when his interrogation began at the sheriff's substation. Corral voluntarily came to the Arvin Police Department, with the expectation that he would be questioned about the rapes. (*Kim*, *supra*, 292 F.3d at p. 974 ["In determining whether suspects were 'in custody' for *Miranda* purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law officers *understanding that questioning would ensue.*"].) Although Corral was transported to the substation solo in an effectively locked patrol vehicle (rather than advised to go there with his mother), he agreed to go with Deputy Dunshee in the latter's patrol vehicle. Upon arrival at the sheriff's substation, after waiting in an interrogation room for 30 minutes, Corral quickly confessed to contacting the girls through another girl's Facebook account by "fak[ing] being her." He explained he picked up the girls to go to a party but instead took them to a remote private gym near the Grimmway Farms facility in Lamont, where he raped them. Until Corral confessed to raping the girls at the private gym, a reasonable person in his situation would have felt free to terminate the interrogation and leave. (See *Aguilera*, *supra*, 51 Cal.App.4th at p. 1162 ["No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest."].) In turn, Corral's initial confession was not the product of a custodial interrogation and was therefore admissible in the prosecution's case in chief.

We need not decide whether the interrogation subsequently evolved into a custodial interrogation—to the extent a reasonable person would not have felt at liberty to walk away after confessing to the rapes— because Corral was not prejudiced by admission of the statements he gave after making his initial confession. (See *Mathiason*, *supra*, 429 U.S. at pp. 493-494 [no error where suspect voluntarily met officer and confessed to theft within five minutes, whereupon he was given *Miranda* warning before a taped confession was taken].)

" 'We review *Miranda* error under the "harmless beyond a reasonable doubt" standard propounded in *Chapman v. California* (1967) 386 U.S. 18, 24.' " (*Saldana*, *supra*, 19 Cal.App.5th 432.) Under the *Chapman* test, error is found to be nonprejudicial when it appears, beyond a reasonable doubt, that the error did not contribute to the verdict. (*Yates v. Evatt* (1991) 500 U.S. 391, 402-403, overruled on other grounds by *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.) An error does not contribute to a verdict when it is "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Id.* at p. 403.)

Here, along with Corral's initial confession that we have determined was admissible, the People presented other exceptionally strong and compelling evidence against Corral. Ashley and Natalie testified about receiving Facebook messages from Ruby and getting picked up at the mall by Corral. Ruby testified she had used Corral's phone to access her Facebook account in the past and that, at the time the messages were sent, she was in juvenile hall where she had no access to her Facebook account. Moreover, both Ashley and Natalie testified regarding the details of the rape. Natalie identified Corral as the rapist in open court. Ashley testified she recognized Corral but was not sure where she had seen him before. Ashley did, however, identify Corral in a photographic lineup shortly after the rapes occurred.

Virginia Bustillos testified that on March 31, 2015, she was awakened at 2:00 a.m. by the girls screaming that they had been raped.

Deputy Dunshee went to the private gym facility described by the girls and found two pairs of female underwear with straight cuts in them, cans of Four Lokos, as well as patches of vomit.

Natalie identified Corral's car at trial. Natalie further testified she had left her belongings in the car and the police subsequently recovered the bag and clothing upon searching Corral's car. A knife was also found in Corral's car and Ashley's phone was located near Corral's house.

We recognize the profound impact a defendant's own statements may have on the trier of fact. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 296 [a defendant's own statements are uniquely probative and damaging evidence].) However, on the present record, even if Corral's statements following his initial confession were inadmissible under *Miranda*, this evidence did not contribute to the verdict in view of the fact that the trier of fact could properly consider Corral's initial confession.

(Doc. No. 13-8 at 13-30 (footnotes omitted)).

## 2. Analysis

Under *Miranda v. Arizona*, a criminally accused has the right to receive certain warnings prior to speaking with police investigators. 384 U.S. 436 (1966). Statements taken by police in violation of a criminal defendant's *Miranda* rights are not admissible in the prosecution's case in chief at trial. *Harris v. New York*, 401 U.S. 222, 224 (1971). Importantly, "*Miranda* warnings are due only when a suspect interrogated by the police is 'in custody.'" *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 107 (quoting *Miranda*, 384 U.S. at 444). In determining whether an individual is in custody for purposes of *Miranda*, courts must consider

1   the circumstances surrounding the interrogation and whether, given those circumstances, a

2   reasonable person would have felt he was not at liberty to terminate the interrogation and leave.

3   *Id.* at 112. The "ultimate inquiry," however, is "whether there is a formal arrest or restraint on

4   freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463

5   U.S. 1121, 1125 (1983) (citation and quotations omitted).

6       "Admission of evidence in violation of *Miranda* requires reversal of a defendant's

7   conviction and sentence only if the error likely had a 'substantial and injurious effect or influence

8   in determining the jury's verdict.'"  *Michaels v. Davis*, 51 F.4th 904, 925-26 (9th Cir. 2022)

9   (relying on *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  If, based on the facts as a whole, a

10  court is "able to determine with fair assurance that the judgment was not substantially swayed by

11  the error," it may conclude the error was harmless.  *Id.* at 926.

12      The state appellate court correctly identified and applied *Miranda* and its progeny as the

13  relevant, controlling federal law.  The appellate court considered the circumstances surrounding

14  Petitioner's questioning and concluded he was not in custody when he made his initial confession

15  such that *Miranda* warnings were not warranted, and the confession was admissible.

16  Additionally, the state court concluded any error in admitting Corral's statements after his initial

17  confession was harmless based on the "exceptionally strong and compelling evidence" against

18  him.  However, for federal habeas purposes, a state court's determination as to whether suspect

19  was "in custody" at time of interrogation for purposes of *Miranda* is not entitled to statutory

20  presumption of correctness because it is mixed question of law and fact warranting independent

21  review by federal habeas court.  *Thompson v. Keohane*, 516 U.S. 99 (1995).

22      Whether Petitioner was in custody requires an examination of the totality of the

23  circumstances surrounding Petitioner's interrogation.  A review of the record supports the

24  conclusion that Petitioner was not in custody for *Miranda* purposes when initially questioned by

25  Deputy Colbert at the Lamont substation.  Petitioner initiated the contact with the police.  He

26  voluntarily presented himself to the Arvin Police Department telling them he wanted to talk about

27  something bad he had done.  He willingly went with Deputy Dunshee to the Lamont substation

28  with the understanding that he was going to be questioned.   After being placed in an

1    interrogation room, he again acknowledged he had come to station on his own accord.  After

2    preliminary questioning by Deputy Colbert, Petitioner early into the questioning volunteered that

3    he faked the Facebook page, pretended to invite he girls to a party, took them elsewhere and

4    violated and raped them.  The tone of Deputy Colbert's interrogation was not threatening or

5    coercive and the questioning was of a relatively short duration.  Even if Deputy Colbert had

6    suspicions of Petitioner's guilt, *Miranda* warnings are not required "simply because the

7    questioning takes place in the station house, or because the questioned person is one whom the

8    police suspect." *California v. Beheler*, 463 U.S. 1121, 1125, (1983) (citing *Mathiason*, 429 U.S.

9    at 495).   Thus, the undersigned finds that the state court's decision that Petitioner was not in

10   custody at this point of questioning by Deputy Colbert was not an unreasonable application of

11   clearly established federal law.

12          The Court need not determine whether Petitioner's subsequent statements were admitted

13   in violation of *Miranda*.  A review of the record reveals that there was other substantial evidence

14   of Petitioner's guilt in addition to his further statements made to Deputy Colbert.  Natalie

15   identified Petitioner in court as her rapist.  Ashley identified Petitioner as her assailant in a photo

16   lineup.   Natalie and Ashley's recitation of the events that unfolded the night of March 30 were

17   consistent with each other.  Physical evidence found (cut underwear, vomit, four cans of Lokos)

18   at the scene corroborated their story.  The red knife as described was found in Petitioner's car,

19   along with Ashley and Natalie's property.  Ruby Nevarez described to police a man named Mike

20   or Michael who lived in Arvin and drove a red car and admitted to using his phone to log into her

21   Facebook account.  Messages from Nevarez's Facebook account to Ashley was consistent with

22   the message Ashley reported to have received led her to accept a ride from a man in a red car.

23   Nevarez identified Petitioner at trial as the man she had earlier described to police.  Given this

24   overwhelming other evidence, Petitioner's subsequent confession did not have "substantial and

25   injurious effect or influence" in determining the trial court's finding of guilt.  *Brecht v.*

26   *Abrahamson*, 507 U.S. at 637.

27          Based upon the foregoing, the undersigned finds that Petitioner has not shown that the

28   state court's decision on the *Miranda* issue was "so lacking in justification that there was an error

1   well understood and comprehended in existing law beyond any possibility for fairminded

2   disagreement," *Harrington v. Richter*, 131 S.Ct. at 786–87, and recommends that ground two be

3   denied.

4        **V.  CERTIFICATE OF APPEALABIILTY**

5        A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

6   court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

7   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

8   district court to issue or deny a certificate of appealability when entering a final order adverse to a

9   petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

10  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

11  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

12  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

13  his constitutional claims or that jurists could conclude the issues presented are adequate to

14  deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.

15  McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing

16  of the denial of a constitutional right, the undersigned recommends that the court decline to issue

17  a certificate of appealability.

18       Accordingly, it is **RECOMMENDED**:

19       1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

20          1); and

21       2.  Petitioner be denied a certificate of appealability.

22       **NOTICE TO PARTIES**

23       These Findings and Recommendations will be submitted to the United States District

24  Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

25  after being served with a copy of these Findings and Recommendations, a party may file written

26  objections with the Court.  *Id*.; Local Rule 304(b).  The document should be captioned,

27  "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

28  **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

38

1    wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

2    CM/ECF document and page number, when possible, or otherwise reference the exhibit with

3    specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

4    the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

5    636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

6    waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

7

8    Dated:    February 7, 2025

9                                                              HELENA M. BARCH-KUCHTA
                                                              UNITED STATES MAGISTRATE JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28